UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**GEORGE J. CANCELMO,**  Chapter 7
    Debtor  Case No. 13-42729-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**DAVID M. NICKLESS, Chapter 7 Trustee**
    Plaintiff
v.  Case No. 14-4038
**GEORGE J. CANCELMO**,
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MEMORANDUM**

**I. INTRODUCTION**

The matter before the Court is the three-count "Complaint to Deny Debtor's Discharge" pursuant to 11 U.S.C. § 727(a)(2), (a)(3), and (a)(4) filed by David M. Nickless (the "Chapter 7 Trustee") of the estate of George J. Cancelmo (the "Debtor"). The Debtor timely answered the Complaint, and the parties, pursuant to this Court's Pretrial Order, filed a Joint Pretrial Memorandum on January 15, 2015. The Court conducted a trial on the merits on April 29, 2015 at which three witnesses testified and 23 exhibits were introduced into evidence. Based upon the testimony and documentary evidence, the Court now makes the following findings of fact and rulings of law in accordance with Fed. R. Bankr. P. 7052.

The only issue presented is whether the Chapter 7 Trustee sustained his burden of proof that the Debtor is not entitled to a discharge. For the reasons set forth below, the Court

finds that the Trustee satisfied his burden of proof and shall enter an order denying the Debtor's discharge.

**II. FACTS**

A. <u>Admitted Facts</u>

The following facts are drawn from the parties' Joint Pretrial Memorandum and are not in dispute.

The Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code on October 25, 2013, together with Schedules, a Statement of Affairs, and Official Form 22A, the Chapter 7 Statement of Current Monthly Income and Means Test Calculation ("Form 22A"). On the petition date, the Debtor resided with Christina Andrianopoulos ("Andrianopoulos") at 111 Amherst Street, Worcester, Massachusetts and had done so for not less than two years prior to the commencement of his bankruptcy case.

The Trustee examined the Debtor under oath at meetings of creditors he conducted on December 2, 2013 and February 3, 2014.

On Schedule B-Personal Property, the Debtor listed assets including two open bank accounts with Commerce Bank with total deposits of $800. The Debtor also listed a 46% ownership interest in a corporation, ECU and US International, Inc. d/b/a/ US Reflector ("ECU"). The Debtor ascribed no value to his interest. He also listed a personal loan to Lawrence Trapasso ("Trapasso") in an unknown amount, and a "company car only" to which he ascribed a value of zero.

The Debtor also listed a number of liabilities on Schedule D-Creditors Holding Secured Claims, Schedule E-Creditors Holding Unsecured Priority Claims, and Schedule F-Creditors

Holding Unsecured Nonpriority Claims, but he did not include any liability for an automobile loan.

On Schedule H-Codebtors, the Debtor did not list any co-debtors.

On Schedule I-Current Income of Individual Debtor(s), the Debtor represented that he was employed at ECU in "Sales/Engineering" and had been so employed for 15 years. He did not list any income from his employment, however, or any other source of income. On Schedule J-Current Expenditures of Individual Debtor(s), the Debtor listed miscellaneous monthly expenses totaling $2,185. He did not list any car payments.

In his Statement of Financial Affairs, the Debtor did not disclose any income other than "Wages and Unemployment." He did reveal involvement in three lawsuits in the year prior to the petition date. Additionally, he represented that he had not been an officer, director, partner, or sole proprietor in ECU.

On Form 22A, the Debtor listed no income in the six months preceding the petition date other than unemployment compensation in the monthly amount of $2,000.

Approximately three months after the commencement of his case and the conclusion of the continued meeting of creditors conducted by the Trustee on February 3, 2014, the Debtor, on February 6, 2014, filed a Motion to Amend Schedules D and F, together with Amended Schedules D and F (the "Liability Motion"). One day later, he filed a Motion to Amend Schedule B-Personal Property and Schedule C-Property Claimed as Exempt, together with Amended Schedules B and C (the "Asset Motion").[1] Pursuant to the Liability Motion,

---

[1] In addition, on May 7, 2014, he filed a Motion to Amend Schedule D and the creditor matrix. The motion filed on May 7, 2014 did nothing more than change the

3

the Debtor added "All Financial Auto" as a secured creditor owed $9,500, with a security interest in a 2005 Honda Odyssey that the Debtor had purchased on October 15, 2013. He also added one creditor to Schedule F and moved two creditors from Schedule D to Schedule F. Pursuant to the Asset Motion, the Debtor added a third bank account at Commerce Bank and two bank accounts with TDBank, a 2005 Honda Odyssey and a notation that he had attempted to surrender his shares in ECU to his father in 2012. The Debtor made no changes to the Statement of Financial Affairs.

On January 3, 2013, the Debtor cashed a check made payable to ECU in the amount of $75,460.95 generated from financing property located on Ward Street, Worcester, Massachusetts. The Debtor retained between $25,000 and $30,000 of the loan proceeds and deposited $20,000 of the loan proceeds in a checking account at Commerce Bank.

The Debtor, d/b/a G Intel, opened a bank account with TDBank on October 7, 2013.

On the petition date, the Debtor was the plaintiff in a divorce proceeding and was subject to a court order issued by the Worcester Probate and Family Court on September 23, 2013. The divorce proceeding was not listed in the Statement of Financial Affairs in response to question 4, captioned "Suits and administrative proceedings, executions, garnishments and attachments."

The Debtor lent Trapasso money but never retained records to show how much money was actually lent to Trapasso. The Debtor provided Trapasso with either cash or checks payable to Trapasso totaling more than $5,000 which were to be used to pay obligations owed

---

mailing address of a creditor.

by the Debtor but were diverted by Trapasso to his own use.

The Debtor issued a check to Andrianopoulos on January 8, 2013 for payment of school costs incurred by Andrianopoulos for one of her children.

The Debtor received unemployment checks between September of 2012 and August 6, 2013. In addition, the Debtor frequently received checks from family members during 2013 for his and his children's support. The Debtor received twenty checks, all in the amount of $300, for a total of $6,000, from January of 2013 through July 26, 2013 from ECU. The Debtor did not report receipt of the $6,000 between January and July of 2013 in his Statement of Financial Affairs or on Form 22A.

The Debtor also received a check in the amount of $5,812.81 from ECU on October 11, 2013. The Debtor did not report the receipt of the $5,812.81 check either on Form 22A or in his Statement of Financial Affairs.

B. <u>Evidence Adduced at Trial</u>

The Debtor's Schedules, Statement of Financial Affairs, and Form 22A, which were executed under penalty of perjury, contain numerous inaccuracies and omissions. With respect to Schedule B, the Debtor had five bank accounts on the petition date, including an omitted account at Commerce Bank and two accounts at TD Bank, one of which involved the use of a d/b/a, namely G Intel. The accounts at TD Bank were opened less than two months before the filing of the petition and were not disclosed until three months after the commencement of the case.

Prior to August 1, 2012, the Debtor was employed by ECU as a Vice-President. The Debtor did not disclose that he was an officer of ECU on Schedule I or in his Statement of

Financial Affairs. The Debtor testified that ECU was a company founded by his father and was struggling financially in the years prior to the filing of his bankruptcy case. ECU ceased doing business in January of 2014. The Debtor's parents enlisted the services of Trapasso, whom they met while he was incarcerated. ECU engaged him to provide management advice as the Debtor's work for ECU was limited to sales and marketing. In the Debtor's words, Trapasso was "[t]o come in and help run the company and take his financial capabilities and government knowledge and everything that he knows and bring business to the company." The company borrowed heavily around this time from an individual, Michael Grilli, who lent the company $140,000 on July 17, 2012, $50,000 on July 23, 2012, and $5,000 on September 19, 2012.

      The Debtor obtained the sum of $75,460.95 in the form of a check made payable to ECU from a financing transaction with Griggs Financial Group LLC ("Griggs"). The Debtor obtained a loan on behalf of ECU in the sum of $90,000 from Griggs, and executed a note secured by a mortgage on property owned by his parents located on Ward Street in Worcester, Massachusetts. The Debtor executed the mortgage under a purported power of attorney from his parents. At trial, however, he admitted that he did not have authority from his parents to mortgage their property. On Schedule F, the Debtor listed his parents as holders of a claim in an "Unknown" amount. The Debtor, together with Trapasso, took the check from the financing proceeds to Broadway Enterprises in Worcester, Massachusetts, a check cashing business owned by a friend of Trapasso, which cashed the check on January 3, 2013. The Debtor disbursed the funds, sharing approximately half with Trapasso and retaining the balance. The Debtor testified that Trapasso was responsible for arranging the

transaction, but he admitted that he executed the mortgage under a power of attorney without his parents' authority.

During the trial, the Debtor testified that he lent Trapasso $75,000 and that Trapasso signed a promissory note in his presence. Trapasso testified he took the money because he was owed wages by ECU. The Debtor failed to disclose the amount of the loan to Trapasso on Schedule B or receipt of the $75,000 in his Statement of Financial Affairs in response to question 10, which requires disclosure of transfers outside the ordinary course of business "either absolutely or for security within two years immediately preceding the commencement of the case." Whether the transaction was a loan or payment of wages is irrelevant to the Debtor's duty to disclose the receipt and transfer of funds.

On Schedule D, the Debtor listed a claim secured by a mortgage on property located at 23 Burtenmar Circle, Paxton, Massachusetts, which property the Debtor owned with his estranged spouse, Francois Cancelmo. The Debtor did not list Francois on Schedule D or H, although he admitted that she was liable with him on the mortgage. On Schedule F-Creditors Holding Unsecured Nonpriority Claims, the Debtor listed claims totaling $458,641.20, including a claim held by Francois in the sum of $4,000, although he omitted reference to the couple's pending divorce proceeding on the Statement of Financial Affairs.

With respect to Schedule I and Form 22A, the Debtor resigned from his position as Vice President of ECU effective August 1, 2012, although he continued to work for the company without pay while collecting unemployment compensation. The Debtor admitted at trial that he failed to disclose monies given to him by his parents for child support, food and transportation. In addition to failing to disclose receipt of $75,460.95, he did not disclose

7

approximately $5,800 given to him by ECU to purchase an automobile. The Debtor made a down payment of $2,000 for a Honda Odyssey and financed the balance of the purchase price. As noted above, the Debtor did not list any monthly car loan payments on Schedule J.

The Debtor testified inconsistently with respect to income from a corporation organized by Andrianopoulos known as US Reflector Group, Inc. At the meeting of creditors, the Debtor testified that Andrianopoulos incorporated the business "to help provide my consulting services so I can move on and have a place I can conduct, do some basic business and develop on my own" and that income received by the corporation in 2013 in the sum of $6,850 was attributable to consulting services he performed. He later retracted that testimony and Andrianopoulos testified that the corporate income was not attributable to his efforts. The Court finds that the Debtor lacked credibility on this subject, as well as others, as many of his responses to questions were evasive and unintelligible.

In his Statement of Financial Affairs, in addition to failing to disclose receipt of $75,460.95, the Debtor listed three pending lawsuits, but failed to list his divorce proceeding. On Schedule B, he initially did not disclose the existence of G-Intel and the bank account he opened using its name. The Debtor also did not disclose the transfer of significant sums of money associated with a start up business in West Africa. The Debtor obtained loans from Ronald Simmons and Ronald Locks in the approximate sum of $150,000[2] for a business venture which he described as follows:

---

[2] On Schedule F, the Debtor listed Locks as the holder of a disputed claim in the sum of $149,353 arising from a "Personal Guarantee of business debt," and Simmons as the holder of a disputed claim in the sum of $66,057.61. He failed to disclose when the claims were incurred and consideration for the claims as required by the Schedule.

> Well, while I was . . . living overseas, I had worked with a lot of people from different countries. And I had one particular friend who moved to West Africa and he brought some mobile advertising business to the country. And he was working like -- and developing and there was what the growth in that country and the need for advertising or bringing in information to villages, you need trucks, trucks that have advertising. So we decided that it would be great if we could purchase some trucks with the advertising and get them out into these locations and do advertising campaigns. And as it works well in Europe, it's a system that's here in North America, so we decided to develop a company, do the investments and get a bank that would give us money in return as a down payment where the banks get money in return in order for us to purchase the vehicles and become operational. But as it turns out, the bank defrauded us. They stole all our money and we lost a lot of – a terrible situation.

In addition to the sums obtained from Ronald Locks and Ronald Simmons, the Debtor testified that he invested approximately $20,000 of his own funds. The Debtor did not list any of the transfers in his Statement of Financial Affairs.

During the trial, the Debtor attempted to explain the inconsistencies in his testimony, and the omissions and inaccuracies in Schedules and Statement of Financial Affairs, blaming his lack of truthfulness on an automobile accident. He testified:

> I started off in the emergency room because when you wake up and you can't see and everything's blurry and you're just not altogether, I -- from there, I had discovered I had head trauma and my pupil sorted [sic] my eye socket, which was the reason for my blurred vision. And then from there I immediately started to be -- have some physical therapy with a chiropractor two days a week following that accident of I believe into January.

The Debtor also indicated that he was treated by an "eye doctor" from "UMass," and that his vision and memory were affected, adding "[a]nd I noticed that, you know, within a week or two when I started to come back and think about things. I had no recollection of when things were or what time period and that still is a - - something that I have -- I deal with all the time."

With respect to his failure to list bank accounts, the Debtor testified as follows:

> I was referring to the Commerce Bank accounts that were closed. And because I had no accounts and I had to -- you can't function without a bank account and all this was happening at the same time, it was just an account that was opened with - - to - - in order to make child support payments and have a - - a place for that. It wasn't done. And I believe the time period that it was okay to continue on and go and doing your life considering that we filled out every - - everything that was supposed to be filled out. So I think it's an overlap of time, certainly a misjudgment and misunderstanding because I don't - - this isn't something I do every day or having a great awareness to do. I can show you that I'm much better at keeping notes and keeping track now.

The Debtor added that he did not list the TD North bank accounts because they were new. As found previously, the Debtor lacked credibility and his attempted explanations were not believable.

### III. DISCUSSION

A. Applicable Law

Section 727(a)(4) of the Bankruptcy Code provides in pertinent part the following:

(a) The court shall grant the debtor a discharge, unless– . . .

>> (4) the debtor knowingly and fraudulently, in or in connection with the case–

> (A) made a false oath or account; . . .

11 U.S.C. § 727(a)(4)(A). "The objecting party must prove each element of its objection to a discharge by a preponderance of the evidence." Xerox Fin. Servs. Life Ins. Co. v. Sterman (In re Sterman), 244 B.R. 499, 504 (D. Mass. 1999); *see also* Agin v. Rivera (In re Rivera), No. 11-1164, 2012 WL 2370101 at *4 (Bankr. D. Mass. June 22, 2012).

In Commonwealth of Massachusetts v. Sohmer (In re Sohmer), 434 B.R. 234 (Bankr. D. Mass. 2010), this Court set forth the standard of proof applicable to 11 U.S.C. § 727(a)(4). This Court observed:

In Boroff v. Tully (In re Tully), 818 F.2d 106 (1st Cir.1987), the First Circuit stated:

> Under § 727(a)(4)(A), the debtor can be refused his discharge only if he (i) knowingly and fraudulently made a false oath, (ii) relating to a material fact. The burden of proof rests with the trustee, In re Shebel, 54 B.R. 199, 202 (Bankr. D. Vt. 1985), but "once it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged." Matter of Mascolo, 505 F.2d 274, 276 (1st Cir.1974).
>
> The statute, by its very nature, invokes competing considerations. On the one hand, bankruptcy is an essentially equitable remedy. As the Court has said, it is an "overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." Bank of Marin v. England, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966). In that vein, the statutory right to a discharge should ordinarily be construed liberally in favor of the debtor. Matter of Vickers, 577 F.2d 683, 687 (10th Cir.1978); In re Leichter, 197 F.2d 955, 959 (3d Cir.1952), *cert. denied*, 344 U.S. 914, 73 S.Ct. 336, 97 L.Ed. 705 (1953); Roberts v. W.P. Ford & Son, Inc., 169 F.2d 151, 152 (4th Cir.1948). "The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." Dilworth v. Boothe, 69 F.2d 621, 624 (5th Cir.1934).
>
> On the other hand, the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." Mascolo, 505 F.2d at 278. Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight. *See* In re Tabibian, 289 F.2d 793, 797 (2d Cir. 1961); In re Shebel, 54 B.R. at 202. The bankruptcy judge must be deft and evenhanded in calibrating these scales.

In re Tully, 818 F.2d at 110 (emphasis supplied). *See also* The Cadle Co. v. Duncan (In re Duncan), 562 F.3d 688, 696 (5th Cir.2009) (citing Tully and shifting the burden to the debtor to present evidence that he is innocent of the offense charged if the plaintiff establishes a prima facie case.). In Duncan, the Fifth Circuit fashioned a five part test in contrast to the First Circuit's two part test. It stated:

> Section 727(a)(4) conditions the debtor's discharge on his truthfulness: "The court shall grant the debtor a discharge, unless ... the debtor knowingly and fraudulently, in or in connection with the case ... made a false oath or account." To prevail on a claim under this subsection, an objecting plaintiff (a creditor or the trustee) must prove by a preponderance of the evidence "that (1) the debtor made a . . . statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy case." Sholdra v. Chilmark Fin. LLP (In re Sholdra), 249 F.3d 380, 382 (5th Cir.2001) (citing Beaubouef v. Beaubouef (In re Beaubouef), 966 F.2d 174, 178 (5th Cir. 1992)). Circumstantial evidence may be used to prove fraudulent intent, *id.*, and the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent, *see* id. at 383.
>
> False statements in the debtor's schedules or false statements by the debtor during the proceedings are sufficient to justify denial of discharge. Beaubouef, 966 F.2d at 178. Further, the materiality of an omission is not solely based on the value of the item omitted or whether it was detrimental to creditors. Id. Rather, the statement need only "bear [ ] a relationship to the bankrupt's business transactions or estate, or concern[ ] the discovery of assets, business dealings, or the existence and disposition of his property." Id. (quoting Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 617 (11th Cir. 1984)). Indeed,
>
>> [t]he recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious. It makes no difference that he does not intend to injure his creditors when he makes a false

12

> statement. Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them.

Id. (quoting Chalik, 748 F.2d at 618).

In re Sohmer, 434 B.R. at 249-50. *See also* Robin Singh Educ. Servs., Inc. v. McCarthy, 488 B.R. 814, 828 (B.A.P. 1st Cir. 2013).

B. Analysis

The Debtor's Schedules, Statement of Financial Affairs and Form 22A have no integrity as they are replete with falsehoods and omissions. As the First Circuit has noted, the statutes are designed to insure that "complete, truthful, and reliable information is put forward at the outset." Tully, 818 F.2d at 110. The Debtor did not provide complete, truthful or reliable information either at the outset of his case, during the meetings of creditors, or during the trial. His Schedules, Statement of Financial Affairs and Form 22A were materially false and the amendments to his Schedules of Assets and Liabilities did not cure many of their defects. Based upon the Debtor's evasive and incoherent testimony, and without the documentary evidence submitted by the Trustee, the Court would be unable to separate fact from fiction with respect to his actual income, assets, and liabilities. His proffered excuse for the deficiencies in his filings with the Court were neither credible nor supported by the competent testimony of a medical professional.

The Debtor failed to initially disclose bank accounts that were recently opened. As the panel noted in In re McCarthy,

> Generally, the status of bank accounts and interests in business all bear a relationship to the debtor's estate. Buckeye Retirement Co., LLC v. Bullough (In re Bullough), 358 B.R. 261, 283 (Bankr. N.D. Tex. 2007) (citations omitted).

13

> "Few, if any, assets are more material to a consumer debtor's financial affairs than a bank account, for it is from that kind of asset that the creditors can discern not only an overall picture of the debtor's financial affairs, but also the detail of the debtor's finances." Id. (citations omitted). In addition, a debtor cannot claim that he omitted an asset because it had little or no value. Debtors have an absolute duty to report all assets "even if they believe their assets are worthless or are unavailable to the bankruptcy estate." Wood v. Premier Capital, Inc. (In re Wood), 291 B.R. 219, 226 (1st Cir. BAP 2003). Thus, a debtor cannot escape the consequences of § 727(a)(4)(A) by asserting that a bank account contains little or no money. In re Sohmer, 434 B.R. at 253 (stating that even if there is little or no money in bank accounts on petition date, debtor had duty to disclose existence of accounts); Fitzgerald v. Gorman (In re Gorman), Adv. Pro. No. 08–1296, 2010 WL 3724775, *6, 2010 Bankr.LEXIS 3249, *18 (Bankr. D. Mass. Sept. 15, 2010) (holding that failure to disclose business interest in accounts was material even if they had no value). As the First Circuit stated, "valuation is not really the point." In re Tully, 818 F.2d at 111 n. 4. "Matters are material if pertinent to the discovery of assets, including the history of a bankrupt's financial transactions . . . [so that] knowing and fraudulent omission of a bank account ... warrants the denial of the discharge." Id. (internal quotation marks and citations omitted).

In re McCarthy, 488 B.R. at 828. Thus, the Court rejects the notion advanced by the Debtor during his counsel's opening statement that the omission of the bank accounts was immaterial because the balances in the accounts were relatively small or that the accounts were overdrawn. The panel in McCarthy rejected a similar argument.

In addition to failing to disclose bank accounts, the Debtor failed to truthfully report his income, and he failed to disclose the receipt of proceeds obtained from the improper financing transaction with Griggs pursuant to which he encumbered his parents' real property. This information is material to the decision of the Trustee or U.S. trustee to move to dismiss a case for abuse. See 11 U.S.C. § 707(b). The Debtor concealed the full extent of his income without any justification or credible excuse. The Trustee sustained his burden that the Debtor is not entitled to a discharge.

14

## IV. CONCLUSION

Upon consideration of the foregoing, the Court shall enter judgment in favor of the Trustee and against the Debtor on Count III of the Trustee's Complaint as the Trustee established by a preponderance of the evidence that the Debtor knowingly and fraudulently made false oaths and accounts in connection with his bankruptcy case. *See* 11 U.S.C. § 727(a)(4)(A). Accordingly, Counts I and II are moot.

By the Court,

*[signature: Joan N. Feeney]*

Joan N. Feeney
United States Bankruptcy Court

Dated: May 20, 2015